UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-21636-CIV-HUCK/O'SULLIVAN

ROSEMARIE HERNANDEZ,

    Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,
a Liberian corporation,

    Defendant.
_____/

## AFFIDAVIT OF JONATHAN B. ARONSON

I, JONATHAN B. ARONSON, under penalty of perjury state as follows:

1. I am over the age of 18 and make the following Affidavit upon personal knowledge and belief.

2. I am and have been admitted to practice law in the State of Florida since 1984 and my license has never been suspended or revoked. I have worked as a Maritime Defense attorney for over 20 years representing a variety of cruise lines and marine underwriters including SeaEscape, Discovery, Dolphin Cruise Line, Costa Crociere s.P.a., Norwegian Cruise Line, Regency Cruise Line, Cunard Cruise Line, to name a few. At one time my firm and I were the local Correspondent for Liverpool and London P&I Club. I also represented domestic insurers in general liability claims, auto negligence, first party insurance coverage in addition to plaintiff personal injury cases.

3. On or about September 21, 2009 I met with Salvatore "Tony" Faso, Director, Medical and Legal Services for Royal Caribbean Cruises, Ltd., Paul Hehir, Director of Litigation

and my former partner, Domingo Rodriguez, at the offices of Royal Caribbean. At that time, I told Mr. Hehir and Mr. Faso that I was leaving my predecessor law firm, Rodriguez and Aronson, P.A. and sought permission to turn over the remaining Royal Caribbean/Celebrity files I was handling, approximately 7 (cases) to my partner, Domingo Rodriguez. Messrs. Faso and Hehir agreed that I could transfer my remaining files to Domingo Rodriguez. On September 26, 2009 I physically left my former employ at 2121 Ponce de Leon Boulevard, Suite 730, Coral Gables, Florida 33134.

4. On September 27, 2009 my access to the firm's server and email were discontinued at my request. Accordingly, I do not and have not had access to my former files since September 27, 2009.

Mr. Faso sets forth that he has personal knowledge of my relationship with Royal Caribbean since 2000. It is my understanding and belief that Mr. Faso did not join Royal Caribbean until February, 2008.

At this juncture, Royal Caribbean has sought to disqualify me in the above-referenced matter. I can provide the following details upon personal knowledge and belief.

5. I represented Royal Caribbean Cruises, Ltd. in various personal injury claims that have been asserted by either passengers (guests) or crew members brought in Miami-Dade County, Florida. These personal injury claims were unique; each was based on the facts and circumstances surrounding the claim and injuries alleged by the Plaintiff.

6. The passenger cases most commonly involved routine personal injuries, such as a slip and fall. Each case was dependent upon its own specific of facts. The analysis of each case would also depend in part on the reputation of the Plaintiff's attorney, the Judge, the appeal and

credibility of the Plaintiff, the nature of the injuries, and the unique facts and circumstances surrounding the injuries.

7. The vast majority of crew cases involved situations where the crew member alleged the ship's physician did not provide prompt, timely or adequate medical care and treatment, or the Plaintiff was not provided his full maintenance and cure. The negligence aspects of these cases typically involved a slip and fall, trip and fall, or lifting of any of a variety of items that subsequently caused injury to the crew member. It should be noted there are generalized liberal legal standards and duties owed to seamen including the "featherweight" burden of proof in a Jones Act negligence action and the strict liability cause of action for unseaworthiness.

8. During my time with Royal Caribbean I was never given, shown or told about:

a. Any "playbook, litigation manual, defense attorney manual or claims handling document" or other document which would set forth how Royal Caribbean would analyze a claim and/or what their attorneys should do to allow Royal Caribbean to analyze a claim. As far as I know, no such document ever existed. If it exists now, I have not seen it and was never given a copy of the document. In addition there were no "unwritten" or "unpublished" procedures I was expected to follow or adhere to.

9. I never had "unfettered access" to secrets and confidences of Royal Caribbean's "in-house legal counsel, adjusters or employees." I never had a password or access to any computer at Royal Caribbean, the Royal Caribbean server, or that would otherwise allow me to obtain any propriety or confidential documents directly from Royal Caribbean. Further, Royal Caribbean has closed circuit television of all entryways space inside and outside the Royal

Caribbean buildings located at both 1050 Caribbean Way and 1080 Caribbean Way where the legal and risk management departments are located, and a key swipe entry system to determine who enters the building and at what time. At no time did I enter the Royal Caribbean buildings during "off hours," or make any attempt to copy documents or otherwise violate the attorney-client relationship. I do not have any "confidential information" or Royal Caribbean secrets.

10. My representation of claimants against Royal Caribbean will not, in any way, shape, fashion or form, place me in a position where I will be forced to essentially "attack" the work which I performed when I represented Royal Caribbean. Each and every case I handled on behalf of Royal Caribbean turned on its own facts. In representing Plaintiffs in cases against the Company, I will not be raising any legal theories that were developed because of my prior involvement as counsel for the Company, or based upon knowledge gained as defense counsel. In short, I do not believe that the positions that I expect to raise in this or other matters will be any different from those that would be raised by any competent legal counsel who had never represented Royal Caribbean.

11. While Mr. Faso contends that I had intimate knowledge of Royal Caribbean's confidential information, Mr. Faso provides only a "broad brush" description of what any reasonably prudent Plaintiff's lawyer would obtain in representation against Royal Caribbean. Mr. Faso suggests the following:

    a. In paragraph number 7(a), of his affidavit, Mr. Faso contends the undersigned has "confidential" information as to "which experts Royal Caribbean uses." This information is readily discoverable in both State and Federal Court by a reasonably prudent practitioner. In State Court, the Florida Supreme Court in *Boecher v. Allstate* provides the basis

to obtain information regarding a party's expert witness retention, the frequency of the retention and the amount paid by the entity to the expert. In Federal Court, Rule 26(2)(b)(v and vi) allows a party to obtain information regarding experts.

   b. In paragraph 7(b), Mr. Faso contends the undersigned has confidential information concerning the process that "Royal Caribbean employs to arrange for medical care for its passengers." The process that Royal Caribbean employs to arrange for medical care of its passengers is set forth in the RCL SQM (Safety, Quality Management) and is neither a "secret" nor work-product. As set forth in this affidavit, the SQM is required through the International Safety Management (ISM) Code created by the International Maritime Organization (IMO). Royal Caribbean routinely provides this information to Plaintiff's attorneys upon request pursuant to the rules of discovery. The SQM documentation was provided by Royal Caribbean to Plaintiff's counsel in the matter of Kevin Chambers (another case where Royal Caribbean seeks my disqualification) months prior to my involvement in this matter. In particular, Royal Caribbean voluntarily produced in discovery the SQM regarding the Chief Doctor, the responsibilities of the ship's medical staff, duties and responsibilities of the ship's physicians and nurses, what and how the ship's physician could "sign-off" a crew member or passenger, how crew members are to be disembarked, the medical records procedures, Seaman's medical examinations, which ports a crew member was to be disembarked and the entire litany of medical procedures.

Ultimately, all maritime employers have to provide medical treatment to their crew members pursuant to duties imposed upon by law. To my knowledge, there is no secret network

of doctors and no propriety manual prescribing how treatment is to be administered in any given case.

      c.    In paragraph 7(c), Mr. Faso contends that the undersigned has confidential information concerning "internal and external factors that increase the difficulty in defending such claims." I was never privy to or aware of any "secret analysis" that Royal Caribbean employed to determine the difficulty in defending any particular claim and I am unaware that the same exists. Again, in my experience, each case was decided on its own merits. Factors such as the availability of crew member witnesses, the positioning of the vessel for shipboard inspection, the injuries suffered by the Plaintiff, the outstanding medical bills, the presiding judge, and the reputation of Plaintiff's counsel are but a few of the factors that one would hope any organization, individual or attorney would use to determine the difficulty in defending a claim. I was never advised that Royal Caribbean maintained any secret or propriety formula for analyzing or defending these cases that was special to Royal Caribbean.

      d.    In paragraph 7(d) of his affidavit, Mr. Faso contends that the Company maintains some kind of propriety "internal claims handling procedure." There has never been an internal claims handling booklet, procedure, or manual that the undersigned has ever seen, received, or heard of. It was well known to the Plaintiff's Bar via basic discovery that Royal Caribbean assigned an individual adjuster to a particular ship for passengers and another adjuster for crew claims. Other than knowing the name of the adjuster who might be handling a particular case, there was no "internal claims handling procedure" that the undersigned was ever aware of, made privy to or made available to during the years the undersigned represented Royal Caribbean.

e. In paragraph 7(e) of his Affidavit, Mr. Faso contends Royal Caribbean had a secret "approach to settlement." I was never privy to or made aware of any such approach. The undersigned would analyze the exposure presented by each case based upon the facts and circumstances of each particular case, and then make recommendations accordingly. The factors I would consider would be: What were the nature and extent of the Plaintiff's injuries? Who was the presiding Judge? What were the out-of-pocket medical expenses? What were the lost wages? How did the Plaintiff "come across" at deposition? How did the cruise line's witnesses "come across" at deposition? What did recent jury verdicts indicate was the value of similar injuries? None of these factors was dependant upon information that had been developed by the Company. Again, there was no "confidential information" as to Royal Caribbean's approach to settlement. To the contrary, their approach to settlement varied little from the approach assumed by numerous other corporate clients whom I encountered during my years as a defense attorney.

f. In paragraph 7(f) of his affidavit, Mr. Faso states that I had "intimate knowledge" as to "potential deficiencies in the Royal Caribbean case." Every case has its own problems that are unique to that particular case. It is neither fair nor accurate to suggest there was some internal information about "potential deficiencies" endemic to Royal Caribbean that applied to every case and I was never apprised of any such information. Any reasonably prudent lawyer can and should be able to identify deficiencies in their case and perceived deficiencies in their opponent's case by employing the rules of civil procedure and discovery.

g. In paragraph 7(g) of Mr. Faso's affidavit, Mr. Faso again states I have intimate knowledge of "remedial actions" suggested by Royal Caribbean's inside counsel to me that should take place aboard Royal Caribbean vessels. That is inaccurate.

In 2007, Royal Caribbean hired Paul Hehir, to start an in-house legal department. The fact of the matter is that Royal Caribbean developed an in-house legal department to reduce or eliminate the need for outside counsel. At no time did I ever discuss with any of the in-house attorneys, adjusters, or any other employee of Royal Caribbean what remedial actions if any should be taken by Royal Caribbean with regard to any particular matter. None of the in-house attorneys ever conveyed such alleged information to me.

12. Faso refers to certain alleged policies and procedures which Royal Caribbean followed for the years 2000 - 2007. I do not understand how Mr. Faso could possess such knowledge, since he was not employed by Royal Caribbean during these years. Nevertheless, despite Mr. Faso's contention regarding policies and procedures, I know from my own personal knowledge that did Royal Caribbean not have such policies and procedures as Mr. Faso describes. In fact, if anything, Royal Caribbean was more notable for the <u>absence</u> of such procedures, a fact which is readily known and discoverable in civil litigation against the Company.

Prior to the arrival of Mr. Hehir in late 2007 and Mr. Faso in early 2008, Royal Caribbean's assignment of cases was handled by non-lawyers. The risk management department was headed by a non-lawyer, Lynn White, who oversaw other non-lawyers (the exception being Vince Warger, who no longer works in Risk Management) who worked as adjusters, supervisors or managers. These individuals handled the cases pre-suit. Once the case went into suit, different people in the risk management department assigned the case to outside counsel. Other than general billing and/or reporting guidelines to the Company and its underwriters which the defense lawyers were given to govern the processing and payment of their bills, there were no

formalized policies or procedures which the outside counsel were required to follow. Outside lawyers, like myself, were required to exercise their best judgment utilizing their education, training, experience and skill, to obtain the best result possible to protect the interests of Royal Caribbean.

13. With respect to the present case, Rosemarie Hernandez alleges that on or about June 29, 2009, she was injured descending stairs near the FlowRider surfing activity aboard the Liberty of the Seas. The FlowRider allows people to "surf" in a controlled area on a cruise ship.

14. I never defended Royal Caribbean in a FlowRider case nor have I ever defended a slip and fall near the FlowRider.

15. I left my prior law firm in September 2009. I was unaware this case even existed. Suit was not filed until some eight month after I opened my own law firm and was no longer handling any type of Royal Caribbean legal assignments.

16. When I represented Royal Caribbean I was never involved or consulted with, handled, or was assigned any cases involving a FlowRider or the area near the FlowRider where Plaintiff fell. I never met with any FlowRider representatives, engineers or experts nor was I ever advised, informed or shown the operation, maintenance and safety procedures for a FlowRider. I have not met with, consulted, reviewed or am aware of any design of stairs near the FlowRider.

17. When I worked with my prior firm, Rodriguez, Aronson, Essington & Ross, P.A.; Rodriguez, Aronson & Essington, P.A.; and Rodriguez & Aronson, P.A., I was never involved with nor was my firm ever involved in any FlowRider cases regarding injuries that occurred on the FlowRider itself or the area surrounding the FlowRider. My prior firm was never asked to

defend Royal Caribbean for any passenger or crew accidents involving the FlowRider or the area where the Plaintiff fell. I was never involved in the defense of any FlowRider "case" that involved anything remotely to do with the facts and allegations of Rosemarie Hernandez.

18. I was never provided any information, confidential or otherwise, regarding a FlowRider on a Royal Caribbean vessel. The reason I was not provided any information regarding a FlowRider is simple. I was never involved in any FlowRider litigation and thus, there would be no reason for me to receive any information regarding the FlowRider from Royal Caribbean. I never had a case involving the FlowRider or the area surrounding the FlowRider.

19. In late 2007 and/or early 2008, Royal Caribbean set into motion a plan whereby outside counsel, such as myself, were to become significantly reduced or eliminated altogether, presumably to limit or to avoid legal expenses. In October/November 2007, Paul Hehir was hired by Royal Caribbean as their Director of Litigation.

20. As far as I can tell from the available records, in the year 2006, 65 cases were referred to the undersigned's law firm of which approximately 34 were handled in some part by the undersigned. The following year, 2007, Rodriguez, Aronson, Essington & Ross, P.A. received approximately 33 cases or half the number of cases from the prior year. The undersigned personally handled less than half the cases from the prior year as several assignments were for one or two opinion letters as to the value of a case.

21. In the following years, the reduction in cases continued. In 2008, 4 cases were assigned to the undersigned by Royal Caribbean to Rodriguez & Aronson, P.A. Thus, in the span of two years, the undersigned's yearly assignments were drastically reduced from approximately 34 to 4 cases, which represented close to a 90% reduction in the number of cases I

received from Royal Caribbean. Then, in 2009 (January 1, 2009 - September 21, 2009), the undersigned received one lawsuit assignment from Royal Caribbean. By that point, it became clear that I was being phased out as a part of the Royal Caribbean litigation team.

22. Royal Caribbean has hired and now has an in-house legal team of at least five (5) lawyers whose goal is to reduce the use of outside counsel.

23. In addition to all of the above, it is important to understand I was <u>never</u> involved in any of the following on behalf of Royal Caribbean at any time:

a. I was never asked to, retained to, involved with or otherwise had any role in any cases involving a sexual assault by either a passenger or a crewmember.

b. I was not involved in the drafting of, approving of, nor was I a part of any committee that drafted, approved or involved in any way with the Arbitration Agreements that are now utilized by Royal Caribbean with their crew members. I did not meet with the Norwegian Seaman's Union or any Union regarding any issue regarding arbitration.

c. I did not draft documents that would be used by the crew members or passengers aboard the vessel such as any sign-on papers, sign-off papers, passenger statements, accident reports, waivers or the like.

d. I was not involved in selecting, approving or otherwise vetting any vendors, including medical providers, shore side medical providers, or vendors who provided supplies or services to the vessel.

e. I was not involved in nor was I asked to assist with at any time in any dram shop allegations made by passengers or crew members.

 f. I was not part of any committee or group that reviewed or analyzed any shipboard or shore side medical treatment or the providing of medical care to passengers or groups.

 g. I was not part of any claims committee. I did not draft nor was I part of any committee that drafted any claims documents, claims guidelines or claims handling procedures.

 24. It should further be noted that Mr. Faso never assigned any cases to the undersigned while Mr. Faso was employed at Carnival Cruise Line, his predecessor employer until February 2008. Thus, the undersigned had no experience with Mr. Faso or his claim handling procedures prior to his joining Royal Caribbean in February 2008.

For the vast majority of the time the undersigned represented Royal Caribbean, the head of the Tax and Risk Management department was Lynn White, a non-lawyer. The passenger claims managers were Katy Yaziciyan and following Katy's death, Pamela Powell. The crew claims manager was Wendy Zepernick until she was demoted in July 2008. None of Mr. Faso's predecessors ever provided the undersigned with any of the "secret and confidential documentation" that Faso claims he gleaned from a "personal review" of documents which Faso has neither produced nor described in any detail.

FURTHER AFFIANT SAYETH NOT.

_____
Jonathan B. Aronson

**SWORN AND SUBSCRIBED** to before me this ___15th___ day of July, 2010.

Personally Known to me.

_____
NOTARY PUBLIC, State of Florida

My Commission Expires:



BETSAIDA BENITEZ
Notary Public - State of Florida
My Commission Expires Nov 8, 2011
Commission # DD 733070
Bonded Through National Notary Assn.